LLEWELLYN JAMES

*v.*

T. OWEN ALLER and wife et al.

[Filed March 19th, 1904.]

1. A settlement by a father, after a second marriage, on the children of the first marriage, covering his homestead and half his personal property, executed voluntarily and without any solicitation from them, will be sustained, though containing no power of revocation, where it was not unreasonable in amount, and was executed with advice of his own counsel, when he was steadily accumulating money and was entirely competent to act.

2. A subsequent gift by the father to his children of his entire property remaining after the previous transfers to them, and constituting the balance of his earnings, made without any advice, when his second wife, who had separated from him, was threatening him with legal proceedings for support, and containing no power of revocation, and without any provision for his future support, may be revoked, though executed without any undue influence of the children.

3. Where a father has executed a gift of property to his children, and they have received the income, relying on the gift of it, and have expended it mainly as the father directed, on the revocation of the gift the income cannot be recovered.

4. A father attempting to set aside an unreasonable settlement of his property on his children, executed in 1881, is not precluded by delay, where he was ignorant of his rights until 1900, and has not by his conduct or delay waived his right to revoke or placed his children in a situation where it would be unreasonable to assert his claim.

On bill, answer, replication and proofs.

*Mr. Benjamin W. Ellicott,* for the complainant.

*Mr. Paul A. Queen* and *Mr. George H. Large,* for the answering defendants.

EMERY, V. C.

This suit calls in question separate transactions of two kinds between complainant and his children. The first transaction

relates to the conveyance by complainant to his children of his homestead, and to the assignment to them, at the same time, of mortgages for $4,200, and the second transaction relates to the delivery, some time later, by the complainant to his daughter, Mrs. Aller, or to his son-in-law, the defendant T. Owen Aller, of money or notes amounting to either $4,000 or $5,000. Complainant's own evidence in relation to the first of these transactions differs altogether from the statement in his bill. In reference to the execution of the conveyances, the deeds for the homestead and the assignment of the mortgages, the bill alleges and the answers admit, that on or about May 20th, 1880, the complainant executed and delivered three deeds for the homestead (a house and lot in High Bridge, Hunterdon county), one conveying one-fifth interest to his daughter Lydia Aller, wife of T. Owen Aller; another conveying a like interest to his daughter Jennie E. James (now Mrs. Hoffman), and a third conveying the remaining three-fifths interest to his daughter Lydia Aller, as trustee for his three remaining children, Lizzie Corson, Maggie James and William James, who were then minors, aged, respectively, twenty, eighteen and fourteen years. These conveyances all reserved to the complainant the rents and profits of the premises as long as he chose to occupy the same, but if he vacated the property before his death the grantees were to receive the rents, subject to his return to the property. The deed to Mrs. Aller, as trustee, was further upon the trust to convey to the minors, respectively, as they came of age, their one-fifth interests, with provision for the minor's receipt of the rents in the meantime and with a power of sale. The bill alleges that complainant was unable to read or write, and that reposing confidence in his son-in-law, Aller, and in his daughters, he was induced to execute and deliver these deeds for the homestead, on the representation that they were papers necessary and proper in order to enable Mr. and Mrs. Aller to properly care for his interests, and that he has learned since their execution that they were deeds for the property. He further alleges that although the deeds purport to be acknowledged by him, he had no knowledge of this, and has learned

since their execution that they were deeds, and that his chil-
dren, with the assistance of Mr. Paul A. Queen, the officer
before whom the acknowledgments were taken, procured him
to put his mark to the papers, well knowing that he did not
intend to part with his title to the property or control over it.
As to the execution of the assignment of the mortgages, the
bill also alleges and the answers admit the execution of three
assignments on the same day, assigning to the same persons
who were grantees in the deeds, and conveying the same inter-
ests, including the three-fifths interest therein to Mrs. Aller as
trustee for the minor children. In these assignments, however,
no reservation is made to the complainant of any right to the
interest during his life or to the principal. The assignment to
Mrs. Aller as trustee further expressly provides that it is made
for the benefit of the minors, and that she is to pay over the
interest (less taxes) to the minors, on their receipt, and assign
to each, as they come of age, their respective shares of the
mortgage. If any of the mortgages are paid, they are to be
reinvested upon other mortgages upon the same trusts. The
bill alleges that these assignments were also made under the
representation that they were necessary in order to enable his
daughter, Mrs. Aller, and her husband to properly care for his
money and property and the management thereof for him, and
that upon the faith of these representations complainant was
induced to fix his mark to these assignments. These charges
as to representations or inducements in the execution of the
deeds and assignments are denied by all of the daughters and
by Mr. Aller. Their execution is claimed to have been the
voluntary act of the complainant and carried out by directions to
Mr. Queen, as complainant's own counsel, and under complain-
ant's instructions, without any consultation whatever with any
of the defendants or knowledge upon their part that the deeds
were being prepared or were to be executed. At the hearing
the deeds and assignments, executed by complainant by the
fixing of his mark, were produced by the defendants. There
was no proof on the part of the complainant of any misrepresen-
tation or inducement leading to the execution of these papers,

and on the contrary, the complainant, who was the only witness called in his behalf as to the circumstances of the execution of the papers, denied absolutely and positively the execution of any of these papers or the fixing of his mark to any of them at any time or place. Upon the part of the defendants, the evidence showed that the complainant, shortly before May 20th, visited Mr. Queen at his office in Flemington and employed him as his attorney to draw the deeds and assignments, giving him instructions as to his wishes and making an appointment for their execution at his home. Complainant had previously met Mr. Queen in business transactions, having purchased from him, in 1878 or 1879, two of the three mortgages assigned. Mr. Queen subsequently prepared the papers according to the instructions and on May 20th drove from Flemington to High Bridge, reaching there early in the evening, and there saw complainant alone in his house, read over and explained each paper to him, receiving further instructions as to the names of some of the children which had not been previously given, and blanks which had been left in the papers as drawn for the insertion of these names were then and there filled up before the execution of the papers.

Complainant's first wife had died in 1876, and Mr. Queen, at the time of the interview in his office, supposed complainant was still a widower, but at the interview at his own house complainant, for the first time, informed Mr. Queen that complainant had been married again about a month before, and after inquiring as to the rights his second wife had in the property, requested that the deeds be dated back previous to the marriage. Mr. Queen declined to comply with this request. None of the children nor any other person than complainant and Mr. Queen were present at this interview between them, which lasted about an hour, and Mr. Queen, without conversing with anyone but Mr. James, at once returned to Flemington with all the papers, which were sent by him to be recorded, and he left them for record on the same evening. After being recorded, they were returned by Mr. Queen either to the complainant directly or to someone for him.

Three of complainant's daughters, Mrs. Corson, Jennie and Margaret, were at their home on this evening when Mr. Queen called, and as each one swears, saw Mr. Queen enter the house and go into a room with their father, and Mr. Queen did not speak with either of them nor did either of them know the business upon which he came. After he left, their father came into the parlor, told them all he had signed papers giving them the home and the mortgages, and that evening, for the first time, their father told them that he had been married again, and that he wanted Mr. Queen to date the deeds back, but that it could not be done. Complainant married his second wife in New York on April 14th, 1880, but did not bring her to his home until after this interview. Mrs. Aller, who lived at another part of the village and was not at home on this evening, was, as she says, told by her father on the next day that Mr. Queen had been up the evening before, and that he had executed these papers. Notwithstanding this detailed account of Mr. Queen as to the preparation and execution of the papers and the evidence of three other witnesses that Mr. Queen was at High Bridge and there saw complainant alone, the complainant, on rebuttal examination, not only repeats his denial that he ever executed any of the papers in question but denies that Mr. Queen ever saw him at his house in High Bridge. He also denies that he ever saw Mr. Queen at his office in Flemington in reference to these transfers and specifies in detail the times when he did see him there, which include the two transactions prior to 1880, when the mortgages in question were obtained by complainant. Complainant is now seventy years of age, is very deaf and somewhat infirm, but I am not satisfied that his denials of his own employment of Mr. Queen at Flemington, and of any directions for the papers, and of the execution of them at his house in High Bridge, are due to failure of mental faculties or to ignorance, and am inclined to think that they must be considered as made with the knowledge on his part of whether they are true or false. So far as relates to this feature of the case—the execution of the papers—the question is whether the transfers were actually executed under the circumstances proved by the de-

fendants. In my judgment the evidence will not support any other conclusion, and if the complainant's right to relief, so far as these transfers are concerned, depended on his making out a case of misrepresentation and actual fraud the bill must be dismissed. But the whole evidence as to the circumstances of the transfers being now fully before the court and the transaction being, on the defendants' evidence, clearly gifts to or settlements upon children by the father, I think the court is bound to consider the question of the validity of the acts upon the whole evidence. The case was argued upon this theory and should, in justice to all the parties, be disposed of on the proofs presented, giving leave to amend the bill if necessary to meet the case as presented and to raise the question arising upon the proofs and argued at the hearing. This observation as to the reliance to be placed on complainant's evidence applies also to the claim made by the complainant's bill in reference to the other transactions brought in question by the bill, viz.; the alleged advances of money or securities to the defendant T. Owen Aller. Complainant's bill charges that about the time of executing the deeds he gave to Aller a county note of $2,000, to collect the interest thereon and invest it, and that subsequently he gave to Aller a sum of $5,000 to invest for him upon mortgage; that Aller has collected the principal of the note and used both sums to purchase a farm in his own name. This latter sum of $5,000, he swears, was delivered into Aller's own hands by him and counted by Aller in the presence of complainant's daughters, Mrs. Aller and Margaret. He also swears that two other amounts of $300 each, not mentioned in the bill, were also delivered to Aller after the delivery of the $5,000. Mr. and Mrs. Aller and Margaret positively deny any such transaction, or the receipt of any sums of money at all by Aller from complainant in their presence at any time, and Aller also denies receiving any money from complainant at any time for investment. As to the $2,000 county note, Aller's testimony is that previous to the execution of the deeds and in 1879, when the Snyder mortgage for $3,000 (one of the mortgages assigned) was obtained by complainant, he (Aller) bought from complain-

ant the county note, and complainant, adding to the proceeds $1,000 of other money, invested the whole amount, $3,000, in the Snyder mortgage. I am satisfied from the evidence that this was the nature of this transaction and that complainant's account is mistaken. Complainant is also mistaken as to subsequently advancing to Aller himself the sum of $5,000 or any other sum. There was an amount of $4,000 in notes or securities belonging to complainant, which came to the hands of Mrs. Aller and not her husband, in 1881, under the circumstances hereafter stated, and which was invested in her name on a note of her husband. This money, after being invested by her husband, along with money of his own on mortgages, was ultimately, when these mortgages were paid off, used together with some money of the husband's in the purchase of a farm by him, his wife holding his note for the $4,000. It is claimed by the defendants that this sum of $4,900 was given to his daughter by the complainant in 1881 upon the trusts that Mrs. Aller should have charge of its investment, that the income should go to the daughter Margaret until she married, when the fund was to be divided among the daughters only, unless she chose to divide it earlier. The $4,000 in notes or securities were delivered to Mrs. Aller to take care of for her father in the spring of 1881, and the directions as to the disposal of it were made in the fall of that year verbally by the father to the daughters, Mrs. Aller and Margaret. The income of this fund has been received by the daughters since 1881 without, as they claim, any demand or request by the father for either principal or interest on it until the filing of this bill, June 19th, 1902. The payment to the father of $1,000 in April, 1900, is admitted, the daughters saying that they gave it voluntarily out of the $4,000 fund while the father says it was a payment on account of the $1,200 mortgage after his demand for that money.

The father left the home at High Bridge to live in Port Oram in 1881, and the daughters received the rents of the house from that time up to 1895, since which date and up to about the time of filing the bill the rents, or a portion of them, were remitted to the father. These payments of principal and interest are

claimed not to have been recognition of any right of the father in the lands or moneys, but to have been voluntary advances by the daughters to the father to assist in his support and to prevent his return to the High Bridge house, as he had a right to do under the deed, with a woman whom he had subsequently married at Port Oram. He had lived with this woman at Port Oram several years previous to his marriage to her, and had by her a son born some years before the marriage and now about twelve or thirteen years of age. The evidence of the defendants must, I think, be taken in preference to that of the father as to the circumstances of these transactions, both in 1880 and 1881, and the questions in the case are whether the settlements, or either of them, are valid against the father and irrevocable by him. The circumstances attending the two settlements and the situation of the donor at the time were different, and they must, therefore, be separately considered.

Complainant was a miner, and for many years prior to 1880 he had been a mining contractor, doing work for the Thomas Iron Company, with the founders of which company he had originally been employed on coming from Wales. Besides paying for his house and lot, he had, at the time the deeds were executed, accumulated probably $3,000 or $4,000 beyond the amount invested in the mortgages in question. His first wife, the mother of his five children, had died in 1876, and he had, in April, 1880, without the knowledge of his children, married a woman named Mary Williams in New York and was about to bring her to his home. One of the daughters (Mrs. Aller) says that before her mother's death she had asked her husband to make some provision for her children, and he promised to do so; but after her death and up to the time of his marriage no conversation appears to have occurred about a settlement between the father and the children. The execution of the transfers was solely the idea of the father, and the motive for making it at the time when it was made was manifestly his second marriage and its object was to protect his daughters against possible changes arising from this marriage. The declarations by the father to his daughters, after Mr. Queen's visit

to High Bridge for the execution of the deeds, shows that this was the occasion for the settlement. Complainant, after receiving the transfers from the record office, kept them, together with his money and other valuable papers, insurance policy, notes, &c., in a box, which was kept in a bureau in her room by one of the daughters, Jennie, who kept house for him after his wife's death and assisted him in his accounts until she was married and left home in 1881. Complainant had brought his second wife to his home shortly after May 20th, 1880, and afterwards in that year pursued his mining business at or near Port Oram, in another county. From this time on he returned to his home in High Bridge only once a month.

In February, 1881, Jennie was married to Mr. Hoffman, and in April, 1881, removed from High Bridge. The second wife was intemperate, and on Mrs. Hoffman leaving home complainant told her, as she says, "the box that is upstairs you take over and give it to Mrs. Aller in her charge, because all that is in that box belongs to the girls." This box contained the deeds and assignments, besides about $1,000 in money and notes amounting to between $2,000 and $3,000, and comprised substantially the entire property of complainant. Mrs. Hoffman delivered the box to her sister, Mrs. Aller, saying to her, as Mrs. Aller says, that "father told her to bring it over to me and to leave it there with us; that we were to take care of it, and he didn't want to leave it with his second wife; he didn't want her to know anything." Shortly after, the complainant, returning home from Port Oram, came to Mrs. Aller's, and in the presence of her father and her sister Maggie, who lived with her, the box was brought out and the contents examined. Mrs. Aller told him what was in it, and he said, "You take good care of it; that is for you girls;" not giving at that time, or until the fall of 1881, any special or further direction as to the disposition of the money. On cross-examination, speaking of the papers, Mrs. Hoffman further says that her father had told her to "take them over to Lydia's for safe-keeping." In August, 1881, complainant's second wife left him, and never afterwards returned, and after she left home complainant gave

up the High Bridge house and resided permanently at Port Oram, visiting Mrs. Aller, however, about once a month, except during the winter, up to 1895 or later. On his leaving High Bridge the son William, then about fifteen years of age, also went to Mrs. Aller's to live. After the second wife left home she wrote a letter, dated August 22d, 1881, to complainant at Port Oram, telling him that she would not return to High Bridge, but was willing to live with him at Port Oram, if he would take a house there, or would consent to separation, either on payment of a monthly sum or a gross sum, with no further claim. She also asked for money to pay her board. Receiving no answer, this letter was followed by another, threatening that if she didn't hear from him at once she would come to Richard Mine (Port Oram), and that he was bound by law to keep her. Complainant (by a friend, Mr. Morris, with whom he boarded and who read the letters to him) answered this letter, stating that she had left his home of her own accord, and Mrs. James replied, denying this, and stating that if he didn't send her money that week to pay her bill for board she would take legal proceedings against him, bring him to Newark and make him disclose the money he was making and the taxes he was paying. She again repeated her offer to take a monthly allowance. Complainant does not seem to have complied with either of these requests or to have paid any further attention to these demands, but I have considered these details important as bearing upon the subsequent action of the complainant in reference to the money and securities in Mrs. Aller's hands. Mrs. Aller says that in the fall of 1881 her father told her and her sister Margaret what disposition was to be made of this money, and it is from the conversation with Mrs. Aller and Margaret James, which then occurred, that the second gift or settlement is dated. Some of the notes had been paid in the meantime, and Mrs. Aller says that

"in the fall of 1881 we had about $4,000, and he told us that was for us girls, and we should invest it and Margaret should have the income; and William wasn't to have any of it, because he didn't know how to use it; he was a dissipated boy; Margaret was to have the income on

the four, as·long as she was home, or she seen fit to divide it; it was under her control, and he would always say it is ours; 'say nothing about it, it is for you girls;' always did, not only once, but a dozen times."

He said she (Margaret) was to have it until she married, or when she seen fit to divide; when she did, she could divide it. Margaret says that at the talk with her father when the box was first brought over he told ·them to collect the notes and put out the money in the spring of 1882.

"I was to have the income. It amounted to $4,000, and that was to be divided between us four children—four girls—and Willie was to have no share in it. I was to keep it until I was married, unless I saw fit to divide it before. My sister, Mrs. Aller, was to look after it; she was the oldest."

This witness fixes the conversation about the final disposition of the money in the spring of 1881, and at the time of receiving the box, but upon this point I consider the evidence of Mrs. Aller more reliable, corroborated, as it is, to some extent, by Mrs. Hoffman's evidence; and as to the exclusion of William, I think both of the daughters are probably giving the tenor of subsequent conversations with their father, for at this time (the fall of 1881) William was a lad fifteen years of age, going to school, and could not have acquired the habits of dissipation. The date of the conversation is important, in my judgment, as throwing light on the character and circumstances of the settlement and on the reasonableness of sustaining it against the father. It comprised substantially all of his property; it was made without advice or counsel, and according to the daughters' account no provision seems to have been made for revocation, either wholly or in part. If made subsequent to the letters of the wife, as apparently it was, it may have been, and probably was, made under the impression that it would be protected against pursuit by the second wife; and while this · second transfer, like the first, was not due to any influence of the daughters, but was, if made as they say, the complainant's volun-, tary act, yet as it was an act done without advice of any kind,

and disposed of his whole property, the question is whether in equity it can stand against a subsequent revocation.

In reference to the transfers of the homestead and of the mortgages in 1880 the children have clearly proved that these were made without any influence whatever upon their part and that they were the voluntary acts of the complainant, made under instructions to his own counsel. Complainant, at the time of their execution, was mentally competent to make them; they were his deliberate and voluntary acts, and under the circumstances the settlements were not unreasonable in amount. Complainant at that time was in the prime of life, was steadily making and saving money, varying from $100 to $200 a month, sometimes as high as $300 or $500. He retained the use of the real estate for his life, if he wished. The mortgages comprised half, or perhaps rather more than half, of his personal property, but although this was a very liberal provision for his children, it cannot, as to the amount, be said to have been unreasonable. It was clearly reasonable for the complainant upon his second marriage to make some settlement upon his children by the first marriage if he wished to do so. Until the mortgages were actually delivered to Mrs. Aller in the spring of 1881, the children do not seem to have themselves received the interest on them, and it was not until complainant's removal from the house that the daughters received the interest, applying it, as well as the rents of the house, mainly to the support of Margaret and William, who from this time were not supported by the father. The only question, as it seems to me, in reference to the settlement of 1880, is whether the transfers are invalid, because no clause of revocation was inserted in the deed or some clause securing complainant's support by the grantees if necessary. The mere omission of a power of revocation will not of itself invalidate a deed. Its absence or the absence of advice as to its insertion are circumstances, and circumstances merely, to be considered in connection with the other circumstances of the case, and if the power be omitted where the settlement would be unreasonable or improvident in the donor unless so guarded, then the settlement will not stand unless the donor had in-

dependent advice as to the insertion of the power and the effect of its omission, and the settlement was the free determined act of the settler after such advice. *Toker* v. *Toker, 3 DeG. J. & S. (68 Eng. Ch.) 487, 491 (Ch. App., 1863)* ; *Hall* v. *Hall, L. R. 8 Ch. App. 430, 440 (1873)* ; *Guarnsey* v. *Mundy, 9 C. E. Gr. 243 (Chancellor Zabriskie, 1873)* ; *Hall* v. *Otterson, 7 Dick. Ch. Rep. 522, 531 (Vice-Chancellor Green, 1894)* ; *Van Houten* v. *Van Winkle, 1 Dick. Ch. Rep. 380, 385 (Chancellor McGill).* Reasonable settlements voluntarily and deliberately made by a parent upon his children, without any solicitation or influence upon their part, although containing no power of revocation, may be sustained even when settlements upon others by the same deed might be set aside for that reason. *Wright* v. *Carter, L. R. 1 Ch. 27, 38, 54, 63 (1903).* My conclusion is that these deeds and transfers, constituting the settlement of 1880, must stand.

The aspect of the gift of $4,000 in 1881 is very different. From the evidence of the three daughters, Mrs. Hoffman, Mrs. Aller and Margaret James, as to the circumstances of the original delivery to Mrs. Aller in the spring of 1881, an irrevocable gift of the notes and money at that time is not made out, and they would seem to have been taken for safe-keeping only. The evidence of Mrs. Aller and Miss James as to the subsequent disposition of these by their father, taken in connection with their subsequent dealing with these securities and the income from them, and the fact that their father never demanded the payment to himself by them of either the income or any part of the principal sum, is sufficient to establish that a verbal gift or settlement of the $4,000 fund was probably made in the fall of 1881. I think, also, that it was made without the exercise of any influence on the part of the daughters, and was made freely by the father to carry out his wishes at that time. And if the only question on this branch of the case were the voluntary and free character of the act, there might be no reason why it should not stand. But in relation to gifts made by a parent to a child, and made solely under the influence of the confidence and trust arising from that relation, the further

question always arises whether the character and circumstances of the gift are such as to impose a duty toward the donor, on the conscience of the donee, who claims that the gift is irrevocable. If it is claimed to be irrevocable, then the court must be satisfied that the settlement was not unreasonable or improvident. If it was, then, under the rule in *Guarnsey* v. *Mundy, supra,* the settlement will be set aside if not guarded by a power of revocation. This settlement was, as it seems to me, clearly of this unreasonable character, and had counsel been consulted it would have been his duty to advise retaining a subsequent power of revocation, or at least the making of provision for the donor's future support from the fund, in case of need. *Powell* v. *Powell, L. R. 2 Ch. 243, 247 (1899)*; approved in *Wright* v. *Carter, L. R. 1 Ch. 57 (1903)*. The gift included the entire property then owned by the father remaining after the transfers of 1880, and constituted the balance of the entire savings of the best portion of his life. It was made without any advice, and as to the motive for making it nothing appears except that at that time his second wife, who had separated from him, had threatened him with legal proceedings for support. He does not appear to have said anything to his daughters at that time about this, and in view of his present denials of the whole transactions, as stated by the daughter (extending even to the existence of the box sent to Mrs. Aller), the motive must be left somewhat to conjecture. It was undoubtedly made by an ignorant man, without any advice as to his rights or as to the propriety of protecting himself by a power of revocation. And while the daughters were guilty of no fraud or undue influence to secure the gift, yet as it took their father's whole remaining property, without any provision for his future support, the obligation was imposed on them, under these circumstances, to recognize his right to recall the gift. That Mrs. Aller and Miss James themselves recognized the pressure of such equitable obligation to support from the funds they had received, appears from the fact that in April, 1900, after the father had asked for the $1,200 mortgage, they voluntarily returned to the father $1,000 of the $4,000, and

that from 1895 they sent to him the rents from the house, or a portion of them. Had the friendly relations between the father and daughters continued, it is probable that the necessary support for the father in his old age would have been furnished by the daughters from the fund in their hands. But these relations having terminated the father now applies for a return of the fund, thus revoking or asking the aid of this court to revoke the gift thus made. I think he is entitled to do so, and that the remainder of the fund now in their hands ($3,000) must be repaid to him, with interest thereon from the time of filing the bill. Defendants are not chargeable with interest before that time. They, equally with their father, acted without counsel in receiving the fund; they received the income, relying on the father's gift of it, and have expended it mainly for the support of Margaret, as the father had directed. From 1881 the complainant did not contribute to the support of either Margaret or William, and after William left the home of Mrs. Aller, and to the time of his death, in December, 1901, he appears to have been dissipated and shiftless, and was supported to some extent by Margaret up to April, 1900. After that time Margaret had in her hands William's share of the mortgage fund ($840), which she claims to have paid out for his benefit, or for the expense of his funeral.

The income of the fund before filing the bill cannot be recovered back. At the hearing the defendants claimed that the whole of the $4,000 fund had been divided before the filing of the bill, but no such claim was set up in the answers of Mrs. Aller and Margaret James; and, on the contrary, the answers of these defendants, after stating that the $4,200 was received from the assignment or payment of the mortgages, March 29th, 1900, say that this money was divided among the defendants, and also "that all said moneys not divided up between the defendants are in the hands of the defendant Margaret James." No claim is made in their answer, which was filed on August 9th, 1902, that the $4,000 has already been divided. The answer of Mrs. Hoffman and Mrs. Corson, the other daughters,

James v. Aller.

filed on August 2d, 1902, say that on the first distribution they each received $840, and that "since then Mrs. Corson has received $750 and Mrs. Hoffman $500." The evidence in relation to the division of the funds is this: In February, 1900, when Mrs. Aller visited her father, he asked her for the $1,200 mortgage, and she then told him that was part of what he gave them, to which he said yes, but he would like to have some, and that then she spoke of the gift of $4,000, and that perhaps they could give him some out of that, and the father then said, "Write me if you can do anything for me and I will come." Mrs. Aller says, further, "He came in April and I gave him $1,000; I mentioned it to my sisters, and they didn't object."

About March 29th, 1900, the mortgages transferred in 1880, or others taken in their place, amounting to $4,200, were collected (by payment or sale) and the proceeds divided among the children, Margaret retaining William's share. On April 30th, 1900, Mrs. Aller gave her father $1,000 by a check for that amount. This was paid out of the moneys received by Margaret and Mrs. Aller from the mortgages as their share of that fund. These sisters also say that after paying their father $1,000, they paid to the other sisters each $750 for their respective shares of the fund invested on the *Aller* note (being now one-fourth of $3,000 instead of $4,000), and that then Mr. Aller gave to Mrs. Aller and Margaret each a note for $2,000, the $4,000 note to Mrs. Aller being surrendered. Whether this transaction of buying out the sisters and taking up the $4,000 note took place previous to filing the bill is not clear, for the only evidence as to the time is that of Mrs. Hoffman, who says that she received money in 1902. But assuming that it did, it took place after all the sisters knew that the father had asked for the return of some of his money in Mrs. Aller's hands, because he needed it, and after they had returned to him $1,000 of this $4,000 fund. This sum had remained invested for nearly twenty years, and mere division or attempted division of the fund among the children so soon after their father called for some of the money cannot be considered

as a disposition of it under the trust, which deprives him of his right to call in question the original·settlement of the fund and to follow the funds in their hands.

The further objection was made that· complainant's claim was barred by the statute of limitation. The relief sought by the bill is the enforcement of an express trust, to which the· statute is not applicable,·and the relief to which the complainant on the proofs is entitled is the setting aside of the settlement of 1881, a purely equitable remedy. Delay in cases of this character is considered, not with reference to the statute, but mainly with reference to its circumstances and effect in each case, and the enforcement of the general equitable rule in this class of cases, which requires vigilance in the prosecution of rights. *Lutjen* v. *Lutjen, 19 Dick. Ch. Rep. 773 (Errors and Appeals, 1902)* ; *Condit* v. *Bigalow, 19 Dick. Ch. Rep. 504, 515 (Vice-Chancellor Emery, 1903)*. "Mere lapse of time is material on the question of right to relief, where the party complaining has by his conduct done that which might be regarded as equivalent to a waiver of the remedy, or by his conduct and neglect has, though perhaps not waiving the remedy, yet put the other party in a situation in which it would not be reasonable to· place him, if the remedy were afterwards to be asserted." Lord Blackburn, in *Lindsay Petroleum Co.* v. *Hurd, L. R. 5 P. C. 221, 239 (1874)* ; *Rochefoucauld* v. *Boustead, L. R. 1 Ch. 196, 210 (1897)*. In this case there has been neither waiver nor acquiescence, for the complainant was ignorant of his rights until 1900 or after; nor (except as to the income) has he by his conduct put the defendants in a situation where it would be unreasonable to assert his right to the balance of the principal sum delivered to Mrs. Aller in 1881.

·I will advise a decree setting aside the gift or settlement of the $4,000 made in 1881 and directing payment to complainant of the $3,000, with interest from the date of filing the bill. At the time of settling the decree I will hear parties, if they desire, as to the separate liability of the defendants, and as to declaring this amount a lien or charge upon the premises of the defendant T. Owen Aller, purchased in part by the use of the fund.